Judgment rendered April 13, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,397-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

KEVIN BELCHER                                   Plaintiff-Appellant

versus

KAWANNA LATRELL                                 Defendant-Appellee
PACE

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 532,132

Honorable Brady O'Callaghan, Judge

* * * * *

HARRIS LAW FIRM, LLC                            Counsel for Appellant
By: Courtney N. Harris

KAWANNA LATRELL PACE                            In Proper Person,
                                                Appellee

* * * * *

Before PITMAN, COX, and ROBINSON, JJ.

**ROBINSON, J.**

Kevin Belcher ("Belcher"), the father, appeals a judgment designating the mother, Kawanna Pace ("Pace"), as domiciliary parent of their minor child, C.P., and awarding shared custody of C.P. to Belcher and Pace, with exchanges made on a week-on and week-off basis.

## FACTS

Belcher and Pace have one minor son together, C.P., whose date of birth is November 15, 2007. Belcher became aware that he was the biological father of C.P. in 2009 when DNA testing conducted as part of child support proceedings confirmed by 99% that Belcher was the biological father of C.P.

Judgment was rendered in May 2010 reflecting Belcher's paternity and ordering child support, which Belcher appealed. Another judgment was rendered in September 2010 setting the child support amount. Belcher first asserted a right to visitation or custody six years later by filing a petition to establish custody in October 2016. A series of petitions was filed by Belcher since October 2016, all of which were resolved with consent judgments providing for shared custody, but containing no designation of domiciliary parent. Compliance with those judgments has been imperfect on both sides.

A mental health evaluation was conducted by Dr. Shelly Booker in June 2017, as agreed to by Belcher and Pace in their most recent consent judgment. After the completion of the evaluation, the court issued an interim order on August 14, 2017, granting temporary custody of C.P. to Belcher and awarding supervised visitation with Pace one day a week. Pace

was further ordered to submit to a ten-panel drug test with Belcher bearing all costs.

On November 20, 2017, a second interim order without prejudice was issued whereby Belcher and Pace were awarded shared custody of C.P. with exchanges on a week-on and week-off basis.

Interim orders issued thereafter maintained the shared custody of C.P., but Belcher was ordered to pay more child support and all expenses associated with C.P.'s counseling, tutoring, and private school. Later petitions requested to modify custody and name Belcher as the domiciliary parent, but they were met with Pace's allegations of Belcher's contempt for failure to adhere to the provisions of the previous orders.

Belcher filed a petition to modify custody on August 12, 2020, when C.P. was twelve years old, alleging defects in Pace's parenting, that the minor child would prefer to live with him, and his superiority as a parent. The matter was scheduled for hearing, and after testimony was adduced on multiple occasions, was submitted for a considered decree to be entered. Belcher was represented by counsel, while Pace no longer had counsel at the time of the hearing. On November 16, 2020, the trial court denied Belcher's petition to modify custody and designated Pace as the domiciliary parent, while continuing the shared custody arrangement. It is from this judgment that Belcher now appeals.

### Dr. Booker Evaluation

On June 21, 2017, Dr. Booker provided the results of her mental health evaluation of Belcher and C.P. and her recommendations. Pace never contacted Dr. Booker or submitted to the mental health evaluation. In part,

2

the evaluation report stated that C.P. expressed confusion over the number of men that his mother had relationships with and introduced him to, and their role and relationship with him. C.P. further expressed that his mother did drugs and smoked weed, and he knew what "dope" was, explaining how his mother rolled the weed in brown papers and smoked weed with friends. C.P. further described to Dr. Booker about going to various homes and seeing his mother buying marijuana and putting it in her bra to take back home, and that she often drank beer and wine to the point that she would vomit or pass out. He stated that he and his brother were in and out of several homes in which marijuana was smoked, bought, or rolled, and that Pace would drink more than she smoked. C.P. further stated that he would take care of his mother when she was intoxicated or vomiting and described vomit in the toilet that he would clean.

Dr. Booker further described, regarding the parent/child session with Belcher and C.P., that it was noticeable that C.P. was responsive to the direction of his father, Belcher, and that Belcher was calm but firm, and that C.P. presented seeking and responding to a relationship with a father figure. C.P. further expressed in detail to Dr. Booker hearing negative statements from his mother about his father and communication from his mother about the court case.

In the evaluation of Belcher only, Dr. Booker stated that Belcher expressed understanding and supported the importance of C.P. having an active, stable father. She acknowledged Belcher's background of being a local owner of a home repair business with over thirty-five rental properties. Belcher also has two adult children, both successful, college graduates, who

3

maintain a strong bond with Belcher. Belcher's youngest child resides with him and is doing well in school, is active, and is overall, a happy child.

In the final recommendation, Dr. Booker expressed that Belcher is an active father to his other children, who have been successful, and that he has adapted his schedule to accommodate the needs of C.P. Due to the history and other issues, C.P.'s behaviors and attitudes were initially challenging for Belcher, but Dr. Booker noted that Belcher remained committed to developing a relationship with C.P. Dr. Booker further noted that the extended family of Belcher wanted to help and get to know C.P., which in Dr. Booker's opinion, was in the best interest of C.P.

Dr. Booker expressed concerns about the information C.P. presented during his evaluation and the detailed reports of his mother's alcohol and drug abuse and recommended that the court further investigate the issues and order a comprehensive drug screen to ascertain the validity of the allegations. If the court deemed those allegations to be valid, Dr. Booker recommended that C.P. would benefit from a stable home and consideration of placement with Belcher and supervised visitation with his mother.

It was further recommended by Dr. Booker that due to Pace's lack of participation in the evaluation, she could not assess Pace or her relationship with C.P., but recommended that the court review the allegations of alcohol and drug use, the emotional and behavioral problems of C.P., the lack of structure and supervision in Pace's home, C.P.'s school problems and medical needs, and stated that an increased presence of Belcher in C.P.'s life would be beneficial.

*Hearing Testimony*

Pace was the first witness called by Belcher to testify at the custody hearing. She first testified regarding her background. Pace is employed as a security guard with a varying schedule. She has another minor child, K.P. She receives caretaking assistance from her fiancé, grandmother, great-grandmother, uncle, and great-uncle. Pace indicated that C.P. has ADHD and a seizure disorder, with medicine prescribed for each condition. She acknowledged that C.P. had occasionally stated that he preferred to live with Belcher, but stated that she is opposed to any change in custody because she has complied with court orders and Belcher has not, including Belcher's refusal to give C.P. his medication.

Donesa Walker, owner of Learning Rx, was also called by Belcher to testify. Walker performed an assessment on C.P. in 2018, determining that he had a low IQ and learning difference, but felt that enrollment in her program would provide a 100% certainty of significant improvement of up to 21 IQ points and 5.6 years of academic skill. She recommended C.P.'s enrollment in the Shekinah Academy and the Learning Rx program, which takes ten months and costs approximately $19,000.

Mr. Belcher then called Jeffrey Coleman, his brother. Coleman testified that, based on his early contact with C.P., he told his brother to "walk away from" the child because he was ill-mannered and illiterate. He indicated that during the time that Belcher had been more active in C.P.'s life, his behavior had dramatically improved. The court noted that Coleman's involvement with C.P. has been almost exclusively in the context

5

of Belcher's family and he had no firsthand knowledge about the precise nature of any disorders afflicting C.P.

Belcher called Donna Henderson, an LPC who saw C.P. in August 2020. C.P. was complaining about depression and was reluctant to communicate. He told Henderson that he did not want to live with his mother, but could not articulate a reason why. Henderson diagnosed C.P. with ADHD and noted that C.P. indicated that, while his mother would regularly give him his medication, his father would not. She stated that she recommended a psychiatric evaluation, which her records indicated had not happened. She stated that C.P. clearly needed therapy, but she was unqualified to provide it, as he would need play therapy based on his limited cognitive level, which she believed was equivalent to that of a 7 or 8-year-old. She was not provided any information about past psychiatric or psychological evaluations of C.P. It was never suggested that she contact the mother for medical history.

Belcher called Letatia Norris, a physician's assistant at Shreveport Family Medicine. Norris signed off on a report dated May 18, 2017, that documented behavioral issues, punctuality issues, and discipline issues exhibited by C.P. and his half-brother when they were brought to the office by Pace. However, the trial court noted that Norris had no information about whether the challenges Pace experienced were due to having little to no assistance in parenting from Belcher, as he only appeared on one occasion. Norris also admitted that she had no personal observation of Pace's interaction with the staff. The children had not been to the clinic since 2017. The court also noted that it contemplated excluding this testimony as

6

irrelevant on its own motion since the standard of proof requires that a material change of circumstances must be shown from the existing consent judgment, which was entered after all of these issues, but the testimony was permitted since Pace made no objection. In addition, in Pace's handwritten brief, she pointed out that the testimony of Letatia Norris was not true and that "she did not witness and did not see anything."

Belcher testified. He first provided background about himself. He has four children. His oldest is 31 years old, has a college degree, and drives for FedEx. His second-oldest has a master's degree and is working on his doctorate. He also has a 13-year-old daughter who lives with him and has no behavior issues.

Belcher acknowledged that he did not interact with C.P. until he was eight years old. He admitted that he never formally sought access to his son until he filed the petition in 2016. However, he wants to be the domiciliary parent so that he can finish molding his son and keep him from getting in trouble. He indicated that he wants the child for the entire summer and during school, with Pace being given visitation only every other weekend and evenings after C.P. is able to come to his worksites with him while he works remodeling houses.

He testified that he gives C.P. his seizure medication but not ADHD medication because he is not required to do so under court order. He does not monitor C.P. taking the seizure medication. He did not put C.P. in Learning Rx because the cost was so high and he was concerned that Pace would not comply with the program. He indicated that he has paid for both the Shekinah Academy and tutoring for C.P. Belcher admitted that he never

used the Our Family Wizard program to address his co-parenting concerns with Pace, as had been required by the trial court.

Belcher complained that Pace does not cooperate with his parenting requests and lacks control over C.P. He related that when he paid for braces for C.P., Pace would allow him to eat things contraindicated by the orthodontist. He admitted that he did not follow the recommendation to bring C.P. for a psychiatric evaluation, claiming that he would have to find a psychiatrist from out of town because he felt that all of the doctors in Shreveport would go along with one another's past recommendations.

Pace called her fiancé, Tyrone Plater, Jr., to testify. Plater indicated that when C.P. returns from staying with his father, his behavior is difficult at first but that it settles down. He testified on cross that he has two adult children of his own from his ex-wife with whom he had joint custody.

The parties agreed to a court interview of C.P. in chambers with only a court reporter present, pursuant to *Watermeier v. Watermeier*, 504 So. 2d 856 (La. 1987). The court observed that C.P. seemed slightly more limited in conversation than other children his age, although it could have been largely attributable to nervousness. C.P. indicated that he loves both of his parents. His life is similar at both houses, in that he has siblings and chores in each home. The court was disturbed at C.P.'s statement that his least favorite thing in both households is being beaten with a belt. In his mother's home, Plater apparently administers corporal punishment, while at his father's home, his father does. Although his explanation was confusing, C.P. stated that he sometimes prefers his dad's house because he does not always understand the discipline at his mother's house. He indicated that he

8

was saddened that his mother was made fun of at his father's house by his father, his half-sister's mother, and his half-sister, and that they used derogatory language toward her. He stated that his mother does not do this about his father.

## DISCUSSION

Belcher contends that: (1) the trial court erred in its designation of Pace as the domiciliary parent and not designating Belcher as the domiciliary parent; (2) the trial court erred in not considering the testimony of C.P. and that he preferred to reside primarily with Belcher; and (3) the trial court erred in not applying the factors for the best interest of C.P. as provided under La. C.C. art. 134.

Belcher notes that child custody decisions are reviewed under the abuse of discretion standard. *Smith v. Holloway,* 53,352 (La. App. 2 Cir. 1/15/20), 289 So. 3d 647, *citing Leard v. Schenker,* 2006-1116 (La. 6/16/06), 931 So. 2d 355. The trial judge's decision in child custody matters is entitled to great weight, and his discretion will not be disturbed on review absent a clear showing of abuse. *Id. Smith v. Holloway, supra.*

### *Designation of Domiciliary Parent; Best Interests of the Child*

In his request for a modification, Belcher cited *Mulkey vs. Mulkey,* 2012-2709, (La. 5/7/13), 118 So. 3d 357. In *Mulkey*, the district court modified a custody plan and named the father as the domiciliary parent, terminated the father's child support obligation and ordered the mother to pay child support. The mother appealed. On appeal, the appellate court held that evidence was insufficient to support the trial court's determination that the harm likely to be caused by the change of environment was substantially

9

outweighed by advantages the child would have if the father were the domiciliary parent and had primary custody. The Louisiana Supreme Court granted certiorari and held that the father proved by clear and convincing evidence that the harm likely to be caused by a change of custody naming him as domiciliary parent was substantially outweighed by its advantages to the child, and the trial court properly accorded weight to the child's preference. The court of appeal was reversed and the trial court decision was reinstated.

In this case, Belcher asserts that, like in *Mulkey,* the harmful effects from a change of environment are substantially outweighed by the advantages of naming Belcher as the domiciliary parent of C.P.

Belcher contends that C.P.'s behavior has significantly improved as a result of his child-rearing decisions and active involvement in C.P.'s life, and that C.P. has responded well to the stability and structure provided by him that C.P. did not receive while in the home of Pace. Belcher further asserts that during the timeframe C.P. was in his temporary sole custody, granting supervised visitation to Pace, he continued to thrive and responded well to the benefits derived from primarily residing with him. When custody was modified to the week-on and week-off schedule, C.P. displayed signs that he was not adjusting well, which can be detrimental considering his mental disabilities and medical issues.

Belcher generally asserts that the trial court erred in its designation of Pace as the domiciliary parent because it is not in the best interest of C.P., noting that the best interest of the child is the paramount consideration in determining child custody. La. C.C. art. 131. He argues that the best

interest of the child is the sole criterion to be met in making a custody award, as the trial court sits as a sort of fiduciary on behalf of the child and must pursue actively that course of conduct which will be of the greatest benefit to the child. *Vidrine v. Vidrine*, 2017-722 (La. App. 3 Cir. 5/2/18), 245 So. 3d 1266.

Belcher believes, based on Pace's actions, that Pace does not desire or do what is in C.P.'s best interest. He claims that when Pace was making sole decisions pertaining to C.P., C.P. was suffering in school and experiencing medical conditions that required treatment and counseling. He argues that, despite receiving SSI benefits that not only provided financial means for the support of C.P., but access to counseling and tutoring, medical professionals, therapy, etc., Pace failed to do anything beyond what was required to maintain SSI payments.

Belcher argues that the trial court erred in its application of La. C.C. art. 134, which provides a list of factors for the trial court to consider in determining a child's best interest in custody matters, as to the following factors:

- Factor (3): The capacity and disposition of each party to give the love, affection, and spiritual guidance and to continue the education and rearing of the child.
- Factor (4): The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
- Factor (5): The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
- Factor (6): The permanence, as a family unit, of the existing or proposed custodial home or homes.
- Factor (7): The moral fitness of each party, insofar as it affects the welfare of the child.
- Factor (8): The history of substance abuse, violence, or criminal activity of any party.

11

- Factor (9): The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.
- Factor (10): The home, school, and community history of the child.
- Factor (11): The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
- Factor (12): The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.
- Factor (14): The responsibility for the care and rearing of the child previously exercised by each party.

Belcher goes into detail as to how his custody of C.P. is in C.P.'s best interest as supported specifically by each of the referenced factors.

In response, the trial court elaborated on the decision in *Mulkey*, wherein the court found several facts which supported a finding of a material change of circumstances from a *considered* decree, under the higher *Bergeron* standard. The Supreme Court summarized:

> At the outset, we agree with the trial court's finding that a material change in circumstances has occurred since 2004. It is clear from the record that the dynamics of both households have changed since the previous custody order. Matthew's age, Vicki's change of employment and work schedule, Phillip's change in home environment and Matthew's academic performance are all changes that materially affect Matthew's welfare.

*Mulkey, supra.*

In cases where the original custody decree is a *stipulated* judgment, such as when the parties consent to a custodial arrangement, and no evidence of parental fitness is taken, the heavy burden of proof enunciated in *Bergeron* is inapplicable. *Wages v. Wages,* 39,819 (La. App. 2d Cir. 3/24/05), 899 So. 2d 662; *Hensgens v. Hensgens,* 1994-1200 (La. App. 3

Cir. 3/15/95), 653 So. 2d 48, *writ denied,* 660 So. 2d 478 (La. 9/22/95). In such cases, the party seeking modification has the twofold burden of proving (1) that there has been a material change in circumstances since the original custody decree, and (2) that the proposed modification is in the best interest of the child. *Lawrence v. Lawrence,* 49,373 (La. App. 2 Cir. 8/13/14), 147 So. 3d 821.

The trial court examined the facts in this case to compare and contrast with the facts in *Mulkey*, while taking into consideration the best interest of the child. The trial court found this case to be distinguishable from *Mulkey*, in that any changes in the household dynamics, not proven at trial to be *recent*, have been improvements in the stability of C.P.'s life *under the consent agreements*. While there is evidence that Belcher has been a positive influence on C.P. since his involvement in C.P.'s life, providing guidance and financial support, the trial court found that nothing has suggested any change in circumstances *since the consent judgments were entered*. Any critique of Pace's parenting would have been from Pace's actions *prior to* the entering of the most recent consent judgment.

The trial court noted that Belcher takes the position that, despite his admission on the stand that he took no interest in rearing his child for almost six years, he is infinitely more qualified than Pace to do so. The central theme of Belcher's argument seems to be that because his involvement in C.P.'s life was good, more must be better. However, the court noted several instances of Belcher's noncompliance with the standing consent judgments and court orders. Belcher has not complied with orders pertaining to the use of the Our Family Wizard communication program. He does not monitor

13

C.P. taking his medication, essentially trusting the medication regimen for seizure prevention to the discipline of C.P., who shows maturity consistent with an 8-year-old. He took C.P. to a counselor to document that he wants to stay with Belcher, but did not comply with that counselor's recommendations regarding psychiatric care. He ignores the court's instructions regarding derogatory language about Pace and permits it not only from his live-in girlfriend, but also from C.P.'s half sibling. The court placed particular emphasis on Belcher's failure to fund the Learning Rx program, finding it was the largest disruption since the standing consent judgment.

The trial court found that Belcher failed to meet his burden under *Mulkey* of proving a material change in circumstance from its standing consent judgment. It found that there was *no* change of circumstances to support a modification, let alone a *material* change. The trial court did indirectly reference several of the factors listed under La. C.C. art. 134, discussing numerous facts it found to be in C.P.'s best interest, although it did not specifically delve into each, including those argued by Belcher. The trial court denied Belcher's petition to modify custody and designated Pace as the domiciliary parent of C.P., ordering continued shared custody of C.P. on a week-on, week-off basis, to be in the best interest of C.P. The court made some adjustments to the judgment for clarification and to reiterate some existing provisions, since they had been ignored by Belcher.

This Court agrees with the finding of the trial court that there has been little, if any, change of circumstances to support a custody modification under the *Mulkey* standard. Also, while we applaud Belcher for his

involvement in C.P.'s upbringing and recognize he has made a positive impact in his life, we agree with the trial court's stance that those changes were made prior to the standing consent judgments such that they would not support a custody modification.

*Child's Preference*

Belcher asserts that the trial court erred by not considering the testimony of C.P. and that he preferred to reside primarily in the residence of Belcher. He argues that, overall, C.P. expressed "more desire than not" to reside primarily with him. He notes that the comment made by C.P. that his father negatively spoke about his mother was contradictory to C.P.'s mental health evaluation with Dr. Booker.

It is unclear from the trial court's judgment whether or not it considered the testimony of C.P., as this factor is not specifically mentioned. In any event, this Court finds that any failure of the trial court to consider the child's preference to be reasonable, given the conflicting testimony regarding the issue and C.P.'s mental capacity.

## CONCLUSION

For the foregoing reasons, at Belcher's costs, this Court affirms the trial court's judgment designating the mother of C.P., Kawanna Pace, as domiciliary parent of the minor child, and awarding shared custody of C.P. to Kevin Belcher and Kawanna Pace, with exchanges made on a week-on, week-off basis.

**AFFIRMED.**